**In the Matter of P.S., a minor child By her next friend, Marjorie HARBIN, Appellant,**

v.

**W.S., and P.S., Appellees.**

**No. 983S320.**

Supreme Court of Indiana.

Sept. 2, 1983.

Rehearing Denied Nov. 1, 1983.

Kenneth J. Falk, Peter L. Cassady, Donald R. Lundberg, Legal Services Organization of Indiana, Inc., Indianapolis, Jane Cullen, Legal Services Organization of Indiana, Inc., Bloomington, for appellant.

Elisabeth M. Daily, Thomas A. Withrow, Diane Hubbard Kennedy, David J. Bodle, Henderson, Daily, Withrow, Johnson & Gross, Indianapolis, for appellees.

PIVARNIK, Justice.

This cause comes to us on a petition to transfer from the Indiana Court of Appeals. The Marion Superior Court, Juvenile Division, refused to grant a permanent injunction which would bar W.S., and P.S., (parents) from having their minor child, P.S., sterilized. The Court of Appeals, Second District, reversed the trial court's decision and remanded the cause with instructions to grant the injunction. *P.S. by Harbin v. W.S.*, (1982) Ind.App., 443 N.E.2d 67.

Although the Court of Appeals held that the trial court had jurisdiction to hear P.S.'s petition, it also held that P.S., made a prima facie case entitling her to injunctive relief and that it was error to require P.S., not the parents, to show that it was not in P.S.'s best interest to be sterilized. Judge Buchanan dissented from the majority opinion, stating that "the juvenile court has jurisdiction to authorize a sterilization if it is demonstrated by clear and convincing evidence that the medical procedure is in the best interest of the child." Judge Buchanan also felt that the procedural posture of the case should not prevent the Indiana appellate courts from holding that a specific enabling statute is not required to authorize a sterilization.

We agree with the position taken in Judge Buchanan's dissent. Accordingly, we grant transfer and vacate the opinion of the Court of Appeals. Our reasons follow.

P.S. has been diagnosed as an autistic child and from the time she was three years, ten months old, has been under the care and treatment of Dr. Marian DeMeyer. P.S. was developmentally disabled prior to thirty months of age. Between her first and second year, P.S. had no inclination to walk or crawl and talking came very slowly. She began to have erratic sleeping patterns, cried a great deal and had uncontrollable tantrums. There was some headbanging in the early years but more frightening, there was a loss of eye contact and she stopped talking. Dr. DeMeyer initially observed that P.S. had an aversion to emotional contacts with people and did not like physical contact of any kind. She had communicative speech but it was described as echohalic, in that she repeated what she heard

other people say. P.S. was extremely irritable at an early age and resisted people who tried to train her and educate her. Although she is toilet trained, her patterns here are still erratic.

The testimony indicated that autism can be caused by damage to the central nervous system, possibly from a measles virus or some other virus to which the mother was exposed during pregnancy. P.S. was not positioned for easy delivery at the time of her birth and delivery was extremely difficult. She was blue at birth. The conditions at P.S.'s birth might have affected her central nervous system. Autism can also be caused by a buildup of phenol alamines or essential amino acids in the blood. This buildup is toxic to the brain. Severe dehydration during the first two years of life can result in autism. In diagnosing autism it is particularly important to obtain a complete family history. There is a genetic component to many cases of infantile autism and consequently the history of presenile dementia. There was evidence that P.S.'s grandmother and aunt are suffering from presenile dementia.

P.S. further suffers from a second neurological condition known as dyspraxia, which makes it difficult for her to carry out most motor activities. She can do some things but it is difficult for her. She cannot copy letters well and is unable to space words properly. Although she has limited ability to read and write, she cannot put a line of letters straight across the paper. She has great difficulty with rhythmic activity such as standing on one leg. Autistic children who also have dyspraxia are extremely difficult to manage, train and treat, especially when hyper-irritability is also present. P.S. also suffers from hyper-irritability. P.S.'s I.Q. has fallen from the 55–65 range down to the 40's. In the last testing by Dr. DeMeyer, P.S. had I.Q. scores in the 20's and 30's. She has decelerated rather than accelerated in this area. Testing of children with learning disabilities is important because part of the hope for their future is that they make accelerated progress in their mental age, particularly verbal age and perceptual motor skills. The medical

experts found it significant that P.S. has been decelerating since the age of two years, four months, when she was first tested by Gail Landy at Indiana University Medical Center.

P.S. is self-injurious, destructive, bangs her head on hard surfaces, picks at her fingers and arms until they bleed and plays with the blood. She has a fascination with blood and likes to play in it. She inflicts injury upon herself to draw blood and then picks at the injury to make it bleed so she can play with the blood. She seems impervious to pain. Dr. DeMeyer and others have attempted to control this behavior by helmet and soft cloth restraints so that she could not gouge her face. Padded splints were put on P.S.'s arms so she could not hit herself and finally her wrists were tied so she could not get her arms up to her face. Three separate surgical operations were performed on P.S. by Dr. Robert Heimburger, former head of the Department of Neurosurgery at Indiana University. These operations were intended to control P.S.'s destructive behavior. Dr. Heimburger attempted to bring into balance the excitatory and inhibitory functions of the brain. The surgeries were not successful and Dr. Heimburger is of the opinion that further surgery in that direction would not alleviate the problem. After P.S. had surgery she would lie in bed and bang her head against the wall. She had large open sores on the top of her head, on her wrists and fingers where she had gouged them. She had open sores on her head because she pulled her hair.

P.S. had been treated at the Delaware Training Center (DTC), a residential and educational facility located in Bloomington, Indiana, where the staff works with autistic children. She also went to Noble School for over two years and is currently at Spaulding School. In the opinion of Dr. Heimburger, P.S. will be institutionalized for the rest of her life. While at the Delaware Training Center, P.S. had her hands tied. She was extremely self-destructive, pulling hair, biting, and had open sores on much of her body. Dr. Heimburger testified that

despite all the protective mechanisms that could be applied, P.S. would bang her head, rip her skin with her fingernails, and resist restraints in order to hurt her own body. It is his opinion that P.S. has severe non-reversible brain damage. Dr. Heimburger testified that the medications, the operant conditioning, and all the training methods that have been applied, including the surgery, have not been sufficient to decrease P.S.'s excitatory responses so that she could function in society in a reasonable and acceptable manner. Dr. Heimburger described P.S.'s self-destructiveness as extremely severe and does not believe there is any surgery that will help at the present time. He believes that it would be very dangerous for P.S. to menstruate. He stated that she becomes extremely excited when she sees her blood and her self-destructive nature indicates that she tears at her own body in order to produce blood when she is in an excited state. In his opinion this presents a life-threatening situation. Also, he knows of no biological reason why P.S. could not menstruate. Dr. Heimburger stated most women who have P.S.'s type of brain damage have an irregular and heavy flow during their menstrual periods and their excitatory episodes are increased markedly by menstruation, probably on a hormonal basis. There is no inhibition of hormonal flow during these times. As a result, P.S. would be more excitable during the pre-menstrual period as well as during the menstrual period than she is otherwise. Dr. Heimburger thinks that to restrain P.S. and physically abuse her in order to keep her from tearing at herself during the menstrual period would be unacceptable. He believes that it would be devastating to P.S. to experience the first menstrual period.

Dr. DeMeyer was also of the opinion that P.S. would be unable to care for herself during her menstrual cycles. P.S. had been known to draw blood from herself by picking at herself and by gouging herself with a fork. Dr. DeMeyer felt P.S. would become agitated over menstruation and would make an effort to find the source of the blood and attempt to keep it flowing. She felt that due to the pattern that P.S. has shown so far it is very reasonable to feel that P.S. might try to induce bleeding by poking into her vagina or abdomen in an attempt to keep the blood flowing. This, of course, would result in hemorrhaging and infection, and possibly death. Furthermore, the burden of the intensive care required to train P.S. at regular monthly intervals to care for herself during her menstrual periods would interrupt her training in other areas and would irritate her to an extent that would increase her head banging and other self-destructive activities.

In addition to Drs. Heimburger and DeMeyer, everyone who had dealt with P.S. in a professional manner shared the opinion that P.S. would be unable to handle the onset of menses. This included Stine Levy, school psychologist at Delaware Training Center (DTC); Joyce Hemming, employed at DTC as a therapeutic recreation specialist; Kimberly Sue Hughes, home programming specialist at DTC; and, Janice Ann Bailey, caretaker at DTC. In addition, members of P.S.'s family observed her characteristics and conduct and felt that sterilization was necessary for her well-being.

All of the above witnesses also felt that P.S. would be unable to handle a pregnancy and would be unable to care for a child should she bear one. Dr. Robert E. Rogers, Professor of Obstetrics and Gynecology at Indiana University School of Medicine, and Chief of the Gynecology Section, examined P.S. and found her pelvic organs and reproductive potential to be normal. He could see no reason why her reproductive capacity would be diminished in any way. Dr. Rogers had personal knowledge of autistic females who became pregnant and felt that P.S. could not care for a child. He also did not feel that P.S. could care for her menstrual needs. It was his opinion that should P.S. become pregnant, her life would be endangered. He supported the parents' decision to provide P.S. with a hysterectomy for those reasons. Both Drs. Rogers and Heimburger know that many institutionalized females are sexually assaulted and the incidence of pregnancies is high. Dr. Heimburger stated if P.S. were to become preg-

nant the results would be devastating to her.

Peg Goldberg became involved with P.S. while P.S. was at the Noble School. Peg Goldberg has master's degrees in several subjects, most notably in social problems and social psychology, as well as two master's degrees in counseling and genetics. She was a case worker for the Marion County Department of Public Welfare and was assigned to deal with battered and sexually abused children for four years. P.S. was at the Noble School for a little over two and one-half years, and was observed by Peg Goldberg for nearly every day during that period. Goldberg is familiar with autistics who have become pregnant. She testified she knows of other severely handicapped individuals who have killed themselves through battering and because P.S. seems impervious to pain, she could batter herself to death as well as gouge herself so severely that she could hemorrhage to death. Goldberg knew personally of one other autistic teen-age girl who killed herself through self-abuse. Thus, the trial court had before it overwhelming testimony by all of the medical, psychiatric, and psychological experts who had dealt with P.S. throughout her life. The above witnesses, as well as the members of P.S.'s immediate family, were of the opinion that to experience menses and pregnancy would be so devastating to P.S. that it would threaten her very life.

The parents contemplated having a partial hysterectomy performed on P.S. without judicial intervention. The hysterectomy was to be partial because the ovaries would remain intact so that P.S. could function normally except that she would not experience menstruation and could not become pregnant. Action was brought by next friend, represented by members of the Legal Services Organization, to seek to have the parents enjoined from permitting the hysterectomy. After hearing all the evidence, the trial court denied injunctive relief and as a part of its judgment made specific findings of fact and conclusions of law as follows:

## ENTRY DENYING INJUNCTIVE RELIEF

" * * *

The Plaintiff's request for specific findings was not timely filed, however, the Court makes the following findings on its own motion.

1. The Plaintiff P.S. is a twelve-year-old female child with an IQ of 46. She suffers from moderate mental retardation, autism and dyspraxia. She is self-destructive and, unless restrained, is capable of inflicting substantial harm to her person and environment.

2. Her self-destructive tendencies are exacerbated by her reaction to blood. This would present a life threatening situation for P.S. should the onset of menses occur.

3. Because of her autism and dyspraxia, P.S. is unable to consistently accomplish motor tasks because she is unable to convey the appropriate signals to muscles necessary to achieve the results desired. She cannot make the connections between the various sensory systems and her motor system with consistency.

4. The Plaintiff P.S. suffers from hyper-irritability which takes the form of self-destruction manifested by such actions as repeatedly beating her head against hard surfaces and ripping and tearing her wrists and arms. Because of P.S.'s self-destructive behavior, retardation, dyspraxia and autism, she cannot be trained by operant conditioning or any other method to successfully manage and care for her personal hygiene during menstruation. Her reaction to caretakers and therapists who would attempt to care for her hygienic needs would be very negative. This reaction would severely disrupt her therapy and training, and lead to developmental setbacks.

5. P.S. has regressed in her language skills and her general IQ level has fallen. She is presently a moderately functioning autistic child and her condition is not likely to improve.

6. It is the opinion of her parents, psychiatrist, neurologist, obstetricians, gynecologist, psychologist and other professionals treating P.S. that a hysterectomy leaving the ovaries intact is essential to avert a life threatening situation for P.S. and for her continued development.

7. The Plaintiff sought to permanently enjoin the Defendants from consenting to a hysterectomy to be performed on their minor daughter P.S. The Plaintiff has failed to sustain her burden of proof in that she has not established that:

(a) P.S. is biologically incapable of conception and procreation.

(b) P.S. is unlikely to engage in sexual activities under circumstances likely to result in pregnancy.

(c) P.S. is capable of caring for herself or a child or is likely to become capable of doing so.

(d) P.S. is capable of understanding the nature of sexual function, reproduction or sterilization and is capable of making an informed consent to the proposed operation or is likely to develop sufficiently to make an informed consent.

(e) other methods of birth control are workable under the circumstances.

(f) The proposed method of sterilization is not the least invasion of P.S.'s body.

(g) The current state of medical and scientific knowledge suggest that less drastic procedures will be available within a reasonable time or that a breakthrough in the treatment of any of P.S.'s disabilities in the near future is likely.

(h) The performance of a hysterectomy is not in the best interests of P.S.

8. The Defendant parents, W.S. and P.S., have constantly and conscientiously sought the assistance of highly qualified experts for their daughter, P.S. The Court believes that parents W.S. and P.S. and their other children have demonstrated in open court by their testimony and through their acts and conduct an uncommonly high degree of love and affection for their child, P.S. This Court believes that the parents, W.S. and P.S., have acted in the best interest of their daughter, P.S., and that they are the proper persons to act for and on behalf of their daughter.

*Conclusions of Law*

1. P.S. has a right to voluntary sterilization. A hysterectomy is in her best interests.

2. Substituted judgment, based on P.S.'s best interests, is permissible because P.S. is incapable by reason of incompetency of making an informed consent.

3. Based upon the Court's findings, the Plaintiff failed to sustain her burden of proof required to support the entry of a permanent injunction.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Plaintiff's request for a permanent injunction should be and hereby is denied.

/s/ _____
Valan S. Boring, Judge"

The parents contend that there was no necessity for judicial authorization for the operation since it is the duty of the parents to seek medical treatment for their child. The parents also claim they have the power to consent to medical treatment for their child pursuant to Ind.Code § 16–8–3–1 (Burns Repl.1983) (consent to medical or surgical treatment of incompetent persons) and Ind.Code § 16–8–4–2 (Burns Repl.1983) (consent of parent to medical treatment of child). The Court of Appeals, Second District, held that regardless of the merits of the parents' position, the case did not reach them in a posture suitable for determining whether P.S. should be sterilized. The Second District felt the trial court was powerless to order or approve such procedure because the parents did not petition the trial court for authority to perform the sterilization. Finding that P.S. made a prima facie case entitling her to the injunction (P.S. accomplished this by showing she was biologically capable of procreation and that her parents intended to have her sterilized),

the Court of Appeals held it was error to deny the injunction.

■ We agree with Chief Judge Buchanan in his dissent that the procedural posture of this case should not prevent this Court from adopting the position of other authorities holding that a specific enabling statute is not required to authorize a sterilization. *In re C.D.M.,* (Alaska 1981) 627 P.2d 607; *In re A.W.,* (Colo.1981) 637 P.2d 366; *In re Grady,* (1981) 85 N.J. 235, 426 A.2d 467; *In re Hayes,* (1980) 93 Wash.2d 228, 608 P.2d 635; *In re Eberhardy,* (1981) 102 Wis.2d 539, 307 N.W.2d 881. *See also In re Sallmaier,* (1976) 85 Misc.2d 295, 378 N.Y.S.2d 989; *In re Terwilliger,* (1982) 304 Pa.Super. 553, 450 A.2d 1376.

The Court of Appeals, Third District, had cited with approval Missouri and California decisions which held juvenile courts powerless to authorize sterilizations in the absence of specific statutory authority. *A.L. v. G.R.H.,* (1975) 163 Ind.App. 636, 325 N.E.2d 501, *cert. denied,* (1976) 425 U.S. 936, 96 S.Ct. 1669, 48 L.Ed.2d 178. Judge Buchanan properly distinguished *A.L. v. G.R.H.,* stating that the Third District, while affirming the trial court's denial of authorization to sterilize, also noted the absence of any showing that such procedures were necessary for the medical welfare of the child. The case before us today indicates just the opposite. To the extent, however, that *A.L. v. G.R.H.* implied that juvenile courts of general jurisdiction in this state lack the power or jurisdiction to authorize sterilization in a proper case, the opinion was in error.

The United States Supreme Court gave a more accurate interpretation of the jurisdiction and authority of a juvenile court to order sterilization in *Stump v. Sparkman,* (1978) 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331, *reh. denied,* 436 U.S. 951, 98 S.Ct. 2862, 56 L.Ed.2d 795. *Stump* involved the circuit court of DeKalb County, which also had juvenile jurisdiction. *See* Ind.Code § 33–12–3–1 (Burns Supp.1982). The United States Supreme Court did not consider the merits of the trial court's order authorizing the sterilization but was concerned only with the jurisdiction of the trial court to entertain the petition:

"We cannot agree that there was a 'clear absence of all jurisdiction' in the DeKalb County Circuit Court to consider the petition presented by Mrs. McFarlin. As an Indiana Circuit Court Judge, Judge Stump had 'original exclusive jurisdiction in all cases at law and in equity whatsoever . . . ,' jurisdiction over the settlement of estates and over guardianships, appellate jurisdiction as conferred by law, and jurisdiction over 'all other causes, matters and proceedings where exclusive jurisdiction thereof is not conferred by law upon some other court, board or officer.' Ind. Code § 33–4–4–3 (1975).[8] This is indeed a broad jurisdictional grant; yet the [Seventh Circuit] Court of Appeals concluded that Judge Stump did not have jurisdiction over the petition authorizing Linda Sparkman's sterilization.

In so doing, the [Seventh Circuit] Court of Appeals noted that the Indiana statutes provided for the sterilization of institutionalized persons under certain circumstances, see Ind.Code §§ 16–13–13–1 through 16–13–13–4 (1973), but otherwise contained no express authority for judicial approval of tubal ligations. It is true that the statutory grant of general jurisdiction to the Indiana circuit courts does not itemize types of cases those courts may hear and hence does not expressly mention sterilization petitions presented by the parents of a minor. But in our view, it is more significant that there was no Indiana statute and no case law in 1971 prohibiting a circuit court, a court of general jurisdiction, from considering a petition of the type presented to Judge Stump. The statutory authority for the sterilization of institutionalized persons in the custody of the State does not warrant the inference that a court of general jurisdiction has no power to act on a petition for sterilization of a minor in the custody of her parents, particularly where the parents have authority under the Indiana statutes to 'consent to and contract for medical or hospital care or treatment of

[the minor] including surgery.' Ind.Code § 16–8–4–2 (1973). The District Court concluded that Judge Stump had jurisdiction under § 33–4–4–3 to entertain and act upon Mrs. McFarlin's petition. We agree with the District Court, it appearing that neither by statute or case law has the broad jurisdiction granted to the circuit courts of Indiana been circumscribed to foreclose consideration of a petition for authorization of a minor's sterilization. (footnote omitted)"

*Id.* at 357–58, 98 S.Ct. at 1105–06, 55 L.Ed.2d at 339–40.

Citing *A.L. v. G.R.H.*, the Supreme Court then interpreted that case to say that a circuit court does have jurisdiction to entertain a petition for sterilization but when presented with such a petition, the circuit court should deny it on its merits rather than dismiss it for lack of jurisdiction. It goes without saying, of course, that if a court of general jurisdiction has the jurisdiction to entertain a particular issue, it has the jurisdiction to decide the issue on the merits and to make a decision by either granting or denying the petition. It would be unthinkable to presume that a court has jurisdiction to entertain an issue and then require it to decide that issue in only one way, that being to deny it. The Second District Court of Appeals recognized this in the present case by holding that the trial court could authorize the sterilization if the issue had been presented to it in a proper procedural posture.

We therefore hold that the juvenile court here did have jurisdiction to authorize the sterilization of P.S. since it had before it clear and convincing evidence that the medical procedure was in the best interest of the child. We again agree with Chief Judge Buchanan in his dissent when he stated as follows:

"In order to circumvent the question whether juvenile courts have jurisdiction to authorize sterilizations, the majority attempts to distinguish this injunction setting from the more typical authorization proceedings which usually confront the courts. But the real question at hand, whether juvenile courts may authorize a sterilization when faced with clear and convincing evidence that such a procedure would be in the best interest of the child, should not be side-stepped (sic) so casually. As the trial court recognized, denial of P.S.'s request for injunctive relief *was in fact* an authorization. Implicit in the denial of injunctive relief by the trial court is the determination that the proposed action is justified and appropriate. To hold otherwise is to exalt form over substance.

The effect of P.S.'s petition to enjoin was to compel her parents to justify their proposed action. Once P.S. showed that harm to her was imminent, *i.e.*, that her parents proposed to take action which would deny her the ability to bear children, it was incumbent upon the parents to demonstrate that the sterilization was in P.S.'s best interest. It is my view that P.S.'s parents more than met that burden." (emphasis in original)

443 N.E.2d at 73.

The appellate courts of this state have the duty to sustain the decision of the trial court on any theory supported by the evidence. *Thornton v. Pender,* (1978) 268 Ind. 540, 377 N.E.2d 613; *Montgomery Ward & Co., Inc., v. Tackett,* (1975) 163 Ind.App. 211, 323 N.E.2d 242. Since P.S. brought the petition requesting injunctive relief, the trial court found that she had the burden of proof. Regardless of where the burden was placed, if it was placed on the wrong party it could only be harmless error in light of the overwhelming evidence presented that sterilization was in P.S.'s best interest. In order for this Court to reverse the trial court the record must demonstrate not only an erroneous ruling but also resulting prejudice. *Atwood v. Prairie Village, Inc.,* (1980) Ind.App., 401 N.E.2d 97; *Honey Creek Corp. v. W.N.C. Development Co.,* (1975) 165 Ind.App. 141, 331 N.E.2d 452, *trans. denied.* Since the trial court heard all of the evidence and decided the pertinent issue in resolving this matter, it argues against all logic, common sense, and justice to require the proceedings to

begin anew and proceed through the courts of this state when the result is a foregone conclusion and would affirm the action taken by the trial court in the first place. There is no reason in fact nor in law to require the parents to seek further judicial authorization to attend to the medical requirements for the health and safety of their child.

Transfer is granted, the opinion of the Court of Appeals is vacated, and the judgment of the trial court is affirmed.

GIVAN, C.J., and HUNTER, and PRENTICE, JJ., concur.

DeBRULER, J., concurs in result with separate opinion in which PRENTICE, J., concurs.

DeBRULER, Justice, concurring in result.

The public policy of this State as embodied in Indiana Code §§ 16–8–3–1 and 16–8–4–2 is that "medical or surgical treatment" of a minor is authorized by law upon consent of a parent. These statutes declare that the decision reached by parents with the concurrence of a doctor, to provide a particular form of medical or surgical treatment for their child, is legally sufficient in the absence of court authorization to justify the battery of the child involved in the treatment. In order for courts to act in a manner consistent with this policy, they should, when considering the petition of a child seeking court protection from a treatment plan agreed upon by the child's parents and physicians, restrict their consideration to the question of whether or not the proposed plan is in fact one involving "medical or surgical treatment". Surgical sterilization can be either treatment or nontreatment. The case of *A.L. v. G.R.H.*, (1975) 163 Ind.App. 636, 325 N.E.2d 501, presents a situation in which the court properly concluded that a proposed vasectomy was not part of a legitimate medical treatment plan for a retarded child. In the present case the hysterectomy proposed for P.S. falls within the scope of legitimate medical treatment of the individual, and as

such, P.S. is not entitled to court protection from it. The trial court was correct therefore in denying the petition of P.S. However, unlike the majority, I find that in proper legal perspective, it is the statute and not the judgment denying the petition which gives legal sanction to the decision of the parents and doctors. This perspective reinforces again my long-held legal opinion that Indiana courts have no jurisdiction upon application of parents, relatives, legal representatives, doctors, hospitals, or others to authorize or order the sterilization of retarded or other incapacitated persons, in the absence of express enabling legislation. I am therefore not in accord with the majority on the jurisdictional point.

PRENTICE, J., concurs.