**In the Matter of the Trust
of Emilie M. FITTON.**

No. 49A02–8908–CV–415.

Court of Appeals of Indiana,
Second District.

Dec. 31, 1992.

David L. Rimstidt, Indianapolis, Ronald B. Noga, Columbus, Ohio, for appellant.

John W. Houghton, Indianapolis, for appellees-trustees.

Edward W. Harris, III, Gayle A. Reindl, Indianapolis, for appellees-beneficiaries.

BUCHANAN, Judge.

## CASE SUMMARY

Appellant James M. Ryan (James) appeals the probate court's judgment against him, claiming the court did not distribute trust funds as required by the language of the Trust of Emilie Fitton (Trust), and that the court erred in denying his objections to the trustees' handling of trust property and by awarding against James' share of the trust, attorney's fees incurred by a trustee as a result of litigation brought by James in an Ohio federal district court.

We affirm in part and reverse in part.

## FACTS

On June 3, 1939, Emilie M. Fitton (Emilie), a widow, executed a trust designed to provide her with income for life. At Emilie's death, one-third of the income was to be paid to Emilie's daughter-in-law, Bertha B. Fitton (Bertha) for her natural life with the remainder of the income of the Trust paid to the four living grandchildren of Emilie M. Fitton. The trust provided that at Bertha's death, all of the income of the trust was to be paid to Emilie's four then-living grandchildren:

"to the settlor's four grandchildren, i.e.: Martha Fitton Whyte and Jane Fitton Fox, daughters of the settlor's son, Harry R. Fitton, deceased, and Virginia Connors Seery and Juliet Connors Ryan, daughters of the settlor's deceased

daughter, Hortense Fitton Connors, in equal shares ..."

*Record* at 14.

The Trust provided that upon the death of the last grandchild, the corpus and accumulated income of the trust was to be distributed among Emilie's great grandchildren:

"This trust shall continue until the death of the survivor of said Bertha B. Fitton, Martha Fitton Whyte, Jane Fitton Fox, Virginia Connors Seery and Juliet Connors Ryan, but shall terminate upon the death of the survivor of said five persons, and the principal or corpus of said trust estate together with any accumulated income or royalties therefrom, shall be paid over and distributed by the Trustee or his successor or the Trustees, as the case shall be, to and among the children or their descendants of said four grandchildren above named, *in equal shares, per stirpes.* If any one of said four grandchildren shall have died prior to the distribution date and have left no child or children or their descendants surviving, or, if leaving such, all thereof shall have died prior to said distribution date, then, the child or children of that sister leaving such shall receive the one-half of the principal of said trust estate.

If both of the sisters of either group of children shall have died and have left no child or children of their descendants them or either of them surviving, then the entire principal of said trust estate shall be distributed to the child or children of their descendants of the other group of children who have died leaving children or their descendants them or either of them surviving, in equal shares, per stirpes." (hereinafter "Clause A").

*Record* at 14–15 (emphasis supplied).

Emilie died on November 23, 1939 and was survived by four grandchildren, Martha Fitton Whyte and Jane Fitton Fox, daughters of Emilie's deceased son, Harry R. Fitton, and Virginia Connors Seery and Juliet Connors Ryan, daughters of Emilie's deceased daughter, Hortense Fitton. Pursuant to the language of the Trust, trust income was divided equally between the grandchildren.[1]

The trust terminated on December 24, 1987, when the last grandchild, Juliet Connors Ryan, died leaving five children, including the appellant, James. In addition, there were nine other great-grandchildren of Emilie surviving at the time of the termination of the Trust:

---

1. While she was alive, Harry's widow, Bertha, received a share of the income. Also, a third child of Hortense, Rosemary Connors, was excluded from the trust because she had entered a convent and taken a vow of poverty.

*Deceased

2. This includes two adopted children.

On September 21, 1988, Merchants National Bank & Trust Co. (Merchants) and Otto N. Frenzel (Frenzel) (collectively "the Trustees") filed a Petition for Construction of Trust Deed and for Instructions and Final Account (Petition). *Record* at 145–64. In the Petition, the Trustees asked the court for clarification regarding how the corpus of the trust was to be distributed and whether the two adopted children of Virginia Connors Seery should be permitted to recover from the trust the same as the biological great-grandchildren. The court deferred consideration of the latter issue until the distribution question could be resolved. Eleven of the fourteen great-grandchildren of Emilie responded to the Petition. On May 16, 1989, all except James entered into a settlement regarding the distribution of trust funds.

Following a hearing on July 18, 1989, the court ordered:

"The principal and accumulated income shares of the above-docketed trust estate are to be determined, and shall be distributed to the remainder beneficiaries *per stirpes* with the four grandchildren of Emilie M. Fitton serving as the roots of the stirpes."

*Record* at 891 (emphasis in original).

There was no evidence of the intent of the settlor (Emilie) other than the document itself. Pursuant to the court's per stirpes distribution order James was entitled to receive $\frac{1}{20}$ of the trust rather than

a ¹⁄₁₂ share if just the biological great-grandchildren of Emilie were entitled to recover in equal shares, or, a ¹⁄₁₄ share if the two adopted great-grandchildren were included in the distribution.

Other matters of the estate, however, had yet to be resolved. On September 21, 1989, the Trustees filed a final accounting of the Trust. James responded citing sixteen separate objections to actions taken by the Trustees throughout the administration of the trust. These objections included allegations that the Trustees had improperly granted oil, gas, and telephone easements on certain trust property located in Illinois, which easements decreased the property's value because it had become, or could become, contaminated with hazardous substances.

In addition, James challenged the Trustees' assessment of $30,705.71 in legal fees against James' share of the Trust, which fees were incurred as a result of a declaratory judgment action brought by James against Trustee Frenzel in an Ohio federal district court. In the Ohio case, James had sought to have the Trust terminated and the corpus distributed pursuant to the provisions of the Trust. Trustee Frenzel moved to dismiss the case for lack of jurisdiction on the grounds that as a resident of Indiana he lacked the requisite minimum contacts with the state of Ohio to be subject to the court's jurisdiction. James responded that Trustee Frenzel had provided, and had a duty to provide, trust services to the Ryan branch of the family all of whom lived in Ohio. Following a hearing, the district court on August 17, 1989 sided with Trustee Frenzel and dismissed the case for want of personal jurisdiction. At no time did Trustee Frenzel ask the district court to award him attorney's fees incurred as a result of defending the Ohio litigation.

Following a three day hearing in Indianapolis on February 20–22, 1990, the trial court, on June 1, 1990, entered an amended judgment affirming its earlier decision in favor of a per stirpes distribution of trust funds. In addition, the court approved the partial settlement agreement entered into by the great-grandchildren and rejected James' objections to the handling of the estate and ordered that the legal fees incurred by the trust in the Ohio case be assessed against James' share of the trust.

## ISSUES

James now appeals from the amended judgment raising several issues which we consolidate and restate as:

1. Did the trial court err in ordering the corpus and accumulated income of the trust distributed on a per stirpes basis?

2. Did the trial court err in denying James' objections to the Trustees' administration of the trust?

3. Did the trial court err in ordering that legal fees incurred as the result of litigation initiated by James against Trustee Frenzel in an Ohio federal district court assessed against James' share of the trust?

## DECISION

ISSUE ONE—Did the trial court err in ordering the corpus and accumulated income of the Trust distributed on a per stirpes basis?

PARTIES CONTENTIONS—James claims that the gift of the principal and accumulated income of the trust was designated to go directly to the great-grandchildren rather than a bequest to them through their parents, Emilie's grandchildren. Therefore, James claims the "per stirpes" language of the trust should be disregarded and the court should instead focus on the language indicating that the distribution of the trust principal was to be in "equal shares," thus entitling him to a ¹⁄₁₂ share (or ¹⁄₁₄ share if the adopted children were included). The Seery and Fox beneficiaries of the Trust argue the language of the trust reflects Emilie's desire to treat the four branches of the family equally and that the great grandchildren were to take by representation through their parents per stirpes, which would result in James receiving a ¹⁄₂₀ share.

CONCLUSION—The court correctly interpreted the trust as a per stirpes distribution.

No one contests the age-old proposition that the primary object in interpreting a trust is to determine the intent of the

settlor. *Meyer v. Northern Indiana Bank and Trust Co.* (1986), Ind.App., 490 N.E.2d 400; *Hinds v. McNair* (1980), Ind.App., 413 N.E.2d 586. The settlor's intent is to be ascertained from examining the trust document as a whole and construing its provisions consistently with each other. *Westervelt v. First Interstate Bank of Northern Indiana* (1990), Ind.App., 551 N.E.2d 1180, *trans.* denied; *Runyon v. Rivers* (1934), 99 Ind.App. 680, 192 N.E. 327.

■ At the heart of this dispute is the language of Clause A which provides that at the termination of the trust the corpus and accumulated income are to be distributed "to the children or their descendants of said four grandchildren ... *in equal shares, per stirpes.*" *Record* at 872. Distribution by "equal shares" usually denotes a per capita distribution in which all beneficiaries receive equal shares of the trust. *See West v. Rassman* (1893), 135 Ind. 278, 34 N.E. 991; *Henry v. Thomas* (1889), 118 Ind. 23, 20 N.E. 519. "Per stirpes," however, refers to a distribution scheme whereby the beneficiaries take the share to which their ancestor would have been entitled, taking it by representation of such ancestor. *Estate of Walters* (1988), Ind.App., 519 N.E.2d 1270, *trans. denied; Estate of Stowers v. Ind. Dep't of Revenue* (1989), Ind.Tax, 533 N.E.2d 1306; Black's Law Dictionary, 5th ed. (1979). In a per stirpes distribution the size of a beneficiary's share depends on how many other beneficiaries are direct descendants of the ancestor. *Estate of Stowers, supra; Estate of Walters, supra.* The apparent contradiction in the instrument before us which links these opposing terms of art can be resolved by looking at other language in the Trust which tends to clarify the settlor's intent.

At one place in the Trust the author is describing what is to happen at the termination of the Trust if a grandchild has no living descendants. What is described in that event is, in effect, a per stirpes distribution (by representation) even though the same linkage is termed "in equal shares, per stirpes":

"then, the child or children of that sister leaving such shall receive the one-half of the principal of said trust estate. If both of the sisters of either group of children shall have died and have left no child or children or their descendants them or either of them surviving, then the entire principal of said trust estate shall be distributed to the child or children of their descendants or the other group of children who have died leaving children or their descendants them or either of them surviving in equal shares, per stirpes." (hereinafter "Clause B").

*Record* at 872.

To the same effect is Trust language which details how the *income* of the Trust is to be distributed upon the death of one of the grandchildren. What is described is a per stirpes distribution:

"said rents, issues, profits and royalties shall be paid ... upon the death of the said Bertha B. Fitton ... to the settlor's four grandchildren, i.e.: Martha Fitton Whyte and Jane Fitton Fox, daughters of the settlor's son, Harry R. Fitton, deceased, and Virginia Connors Seery and Juliet Connors Ryan, daughters of the settlor's deceased daughter, Hortense Fitton Connors, in equal shares, for and during their natural lives respectively. If any one of said four grandchildren shall die and shall leave a child or children or their descendants her surviving, the share of the income which their mother would have received shall be paid to such child, children or descendants until the time for the termination of this trust. If any one of said four grandchildren shall die and shall leave no child or children or their descendants her surviving, then the share of said income and royalties which such deceased grandchild would have received shall be paid to her sister, if living, and if dead, to the child or children of such deceased sister, if any, and if none, then to her said cousins, if living, and if dead, until the time for the termination of this trust, as hereinafter fixed."

*Record* at 14.

■ The conclusion seems inescapable that gift by representation is the intended scheme of distribution, despite what may

seem like the juxtaposition of two conflicting concepts by the drafter of the Trust. When a testamentary provision provides for a devise to the heir of a named person, a per stirpes distribution may be presumed. *Runyan v. Rivers* (1934), 99 Ind.App. 680, 192 N.E. 327. In *Runyan* this court considered language of a will which provided:

> "Item 6. The residue of my part of our estate I want divided equally between the heirs of my deceased brothers and sisters, Abigail Grennard, Lucreta Bunnel, Dennis Rusk and Squire Rusk."

*Id.* at 681, 192 N.E. at 328.

The appellant in *Runyan* was the only heir of Squire Rusk while Dennis Rusk and the other two sisters left several children or their descendants surviving at the date of the death of the testatrix. When the executor of the will sought to distribute the residuary estate among the nephews and nieces (or their descendents) per capita, the appellant objected. Although the provision did not include language explicitly referring to a per stirpes distribution the court nonetheless concluded that such a distribution should be presumed:

> "A devise to the 'heir' of a named person, whether the testator or another is, ordinarily, in the absence of any expression showing a contrary intention, taken as a direction for a distribution *per stirpes* ..."

*Runyan, supra.* at 683–84, 192 N.E. at 328 (quoting 2 Page, on Wills (2d Ed.) Section 946, p. 1587); *see also Henry v. Thomas* (1889), 118 Ind. 23, 20 N.E. 519.

While in *Runyan* the beneficiaries were unnamed heirs of the testator's brothers and sisters named in the testator's will, the beneficiaries in this case are the unnamed children or descendents of Emilie's living grandchildren. Thus, the legal presumption in favor of a per stirpes distribution should apply absent, of course, a contrary intention evident from the language of the Trust. As the testamentary provision in this case, unlike in *Runyan*, uses the words per stirpes—"to and among the children or their descendants of said four grandchildren above named, in equal shares, *per stirpes*"—an intent in favor of a per capita distribution is not present despite the inclusion of the words "in equal shares." That term may either be harmless surplusage or simply an indication that, if a great-grandchild died before the termination of the trust, there should be an equal division among the descendants of the grandchild within that stirpes, a situation that did not happen in this case.

We also observe that Emilie died before the birth of her great-grandchildren, the ultimate recipients of the corpus and accumulated income of the trust. Unless she was clairvoyant these great-grandchildren would be unknown to her, making it more likely that Emilie intended for them to take by right of representation through her four grandchildren who were alive at the time of her death and specifically mentioned in her trust.

ISSUE TWO—Did the trial court err in denying James' objections to the Trustees' administration of the Trust?

PARTIES CONTENTIONS—James contends that the Trustees entered into unauthorized easements which caused, or could eventually cause, environmental damage to the trust property, thus decreasing its value. In addition, James argues that the trial court erred in discharging the Trustees from liability with regard to possible contamination of the trust property due to unauthorized oil and utility easements. The Trustees respond that James has failed to show that the easements were unauthorized or that he suffered harm as a result of the granting of the easements.

CONCLUSION—James has not demonstrated he was harmed by the easements.

■ Following the accounting by the Trustees, James made a number of objections regarding easements and rights-of-way granted by the Trustees. These objections are summarized in James' appellate brief:

> "Objection No. 1: EASEMENTS GRANTED TO TEXAS EASTERN GAS TRANSMISSION CORPORATION WERE UNLAWFULLY GRANTED BY THE BANK AND ARE VOID OR VOIDABLE.
>
> Objection No. 2: EASEMENTS GRANTED TO SOHIO PIPELINE COMPANY WERE UNLAWFULLY GRANTED AND ARE VOID OR VOIDABLE.

Objection No. 3: EASEMENT GRANTED TO FARM BUREAU OIL COMPANY EXECUTED WITHOUT LAWFUL AUTHORITY AND IS VOID OR VOIDABLE.

Objection No. 4: RIGHT OF WAY GRANTED TO CROSSVILLE TELEPHONE COMPANY GRANTED WITHOUT LAWFUL AUTHORITY AND IS VOID OR VOIDABLE.

Objection No. 5: RELEASE OF ALL CLAIMS TO SUPERIOR OIL COMPANY BY UNAUTHORIZED INDIVIDUAL IS VOID OR VOIDABLE."

*Appellant's brief* at 8–9.

■ Even assuming James is correct that the trustees lacked authority to enter into such agreements, he is still required to show he was harmed by the Trustees' action. *See Hebel v. Conrail,* Inc. (1985), Ind., 475 N.E.2d 652; *P.S. by Harbin v. W.S.* (1983), Ind., 452 N.E.2d 969. In support of his claim of prejudice, James offers an environmental study showing that soil and groundwater on the Trust property contained an excessive level of chloride and petroleum hydrocarbons. James also suggests that, although the study did not show the presence of PCBs, there was a "significant risk" that the property had been contaminated with PCBs and that because of the oil and gas pipelines crossing the property, the trust property has become "a likely target for the application of strong Federal and State environmental protection laws which impose strict liability for cleanup on landowners." *Appellant's brief* at 37. As a result, James claims that the Trustees "have jeopardized the value of the Trust property and created potential liabilities which exceed the value of the land." *Appellant's brief* at 38.

James, however, presented no evidence regarding the effect any actual or potential environmental damage had on the value of the Trust property. Instead his claim is based on speculation that the value of the property has been reduced because of the possibility that, sometime in the future, PCBs, toxic waste, or hazardous waste will be found on the property, resulting in the federal or state government ordering an expensive clean up or strict liability law-

suits against the owners of the Trust property. Speculation, however, cannot be the basis of a damage claim. *Gasway v. Lalen* (1988), Ind.App. 526 N.E.2d 1199; *Persinger v. Lucas* (1987), Ind.App., 512 N.E.2d 865. James has failed to demonstrate he was harmed by the Trustees granting of the easements. *Harbin, supra; Marriage of Sloss* (1988), Ind.App., 526 N.E.2d 1036.

■ James also claims that under the Comprehensive Environmental Response, Compensation, and Liability Act (also known as the Superfund Law) passed by Congress in 1980, the Trustees could not be discharged from a potential strict liability claim because of the "substantial risk" of PCB contamination of the Trust property. In support of this claim James theorizes that because Texas Eastern Transmission Corporation (Texas Eastern), which has pipelines that cross the trust property, entered into a consent decree recognizing that PCBs were being stored, disposed of or released into the environment at Texas Eastern, PCBs could also be found on the trust property. *Appellant's brief* at 39. James bolsters his claim by pointing to evidence which indicates PCBs were found at a site twenty miles from the trust property and the trust property was "burdened by a metering station which was subject to testing for PCB's." *Appellant's brief* at 39.

Once more James speculates. The evidence he cites in support of a "substantial risk" of potential environmental damage from PCBs is weak at best. PCBs were discovered at a site *twenty* miles away. *Record* at 2009. There was no pumping station on the property. *Record* at 2009. The only underground storage tank which had been on the farm had been removed. *Record* at 2015–16. PCBs have never been found on the property. *Record* at 1960–61.

While one could suppose a remote possibility exists that PCBs would later be found on the farm, to forbid the discharge of the Trustees based on that remote possibility is impractical. Environmental damage may happen on virtually every piece of property. To forever prohibit the discharge of trustees because of that possibility the property they are obligated to ad-

minister may later suffer environmental damage, would substantially impair the administration and disposal of trust property. Nonetheless, it seems evident that if the property later become damaged by PCBs, the beneficiaries of the trust would be entitled to pursue a damage claim against any company which caused the environmental damage in order that they be compensated for the lost value of the property.

ISSUE THREE—Did the trial court err in ordering that legal fees incurred as the result of litigation initiated by James against Trustee Frenzel in an Ohio federal district court be assessed against James' share of the trust?

PARTIES' CONTENTIONS—James claims he did not act in bad faith in bringing the the Ohio lawsuit and that the $30,705.71 award of attorney's fees awarded against his share was unreasonable. The Trustees and the Seery and Fox beneficiaries join to argue that the Ohio litigation was "baseless" and "groundless" and therefore the award of attorney's fees was proper.

CONCLUSION—The trial court erred in ordering $30,705.71 in attorney's fees from the Ohio litigation be assessed against James' share of the Trust.

At the outset we know that in general state courts have no power to review, in any manner, the decision of a federal court. *Woolery v. Grayson* (1887), 110 Ind. 149, 10 N.E. 935. In this case the Trust asked an Indiana trial court to review the merits of the federal court litigation and approve their decision to assess attorney's fees against James' share of the estate because the Ohio litigation was "baseless" and "groundless."

It would seem that a determination as to the *merits* of litigation for the purpose of sanctioning a party with attorney's fees is properly the function of the court in which the case was litigated. Although the district court dismissed the Ohio litigation because it lacked personal jurisdiction over

Trustee Frenzel, the district court could have reviewed the merits of James' claim and awarded attorney's fees to the Trust. *See* Federal Rules of Civil Procedure, Trial Rule 11; Ind.Code 34–1–32–1 (1988)(b); *Mareno v. Rowe* (2nd Cir.1990), 910 F.2d 1043; *Ault v. Hustler Magazine, Inc.* (9th Cir.1988), 860 F.2d 877. Trustee Frenzel, however, *never* requested attorney's fees from the federal court and the district court dismissed the Ohio litigation without deciding whether there was a lack of merit to James' claim or that James was acting in bad faith by filing the case in a court which clearly lacked jurisdiction, circumstances which might support ordering James to pay attorney's fees. It would not seem proper for an Indiana trial court to belatedly sanction a party with an award of attorney's fees based on its review of a case litigated in federal court.[3] *See* T.R. 11; *Woolery, supra.*

Even if the Indiana court had the power to review the merits of the Ohio litigation, the findings issued by the court do not support the award of attorney's fees against James' share of the estate:

"(b) *The Trustees acted reasonably in defending the Ohio Lawsuit* in the name of Otto N. Frenzel, Trustee, as defendant, and reasonably incurred attorney fees (including disbursements) in the total amount of $30,705.71, *which amount was properly incurred as an expense of administration of the Fitton Trust and was properly paid out of funds of the Trust.*

(c) The Court finds against James M. Ryan and for the Trustees and for the beneficiaries other than James M. Ryan that such amount, $30,705.71, without interest, should be allocated to, and charged against, the interest of James M. Ryan in the Trust."

*Record* at 1389 (emphasis supplied).

The court's findings in (b) do not support its assessment of attorney's fees in (c)

---

3. Another problem with allowing a court to review the merits of a case litigated in another court for the purpose of sanctioning a party with an award of attorney's fees, is that it invites an extensive, time-consuming, duplicitous relitigation of evidence, a fact illustrated by a record in this case which consists of twelve volumes and 2817 pages, a considerable part of which is devoted to the issue of attorney's fees.

*against James' distributive share.* As a general rule, attorney's fees are not recoverable unless there is a statute or contract stipulating that such fees may be recovered. *Greensburg Local # 761 Printing Specialities v. Robbins* (1990), Ind.App., 549 N.E.2d 79, *trans. denied; Perry County Council v. State ex rel. Baertich* (1973), 157 Ind.App. 586, 301 N.E.2d 219, *trans. denied.* Ind.Code 34–1–32–1(b) (1988) provides that in order to sanction a party with an award of attorney's fees, a court must find the litigation was "frivolous", "unreasonable", "groundless" or "[l]itigated in bad faith":

> "In any civil action, the court may award attorney's fees as part of the cost to the prevailing party, if it finds that either party:
>
> (1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;
>
> (2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or
>
> (3) litigated the action in bad faith."

This court has yet to consider a case in which attorney's fees are assessed against a beneficiary's share of a trust because the beneficiary initiated meritless litigation which depleted the value of the trust. However, other jurisdictions, have held that if an action brought by a trust beneficiary is determined to be "groundless," "vexatious" or otherwise lacking in merit, legal fees incurred by the trustee can be ordered assessed against the beneficiary's share in the trust rather than against the entire corpus of the trust. *Childs v. National Bank of Austin,* 575 F.Supp. 634 (N.D.Ill.1983); *Conley v. Waite* (1933), 134 Cal.App. 505, 25 P.2d 496; *Patterson v. Northern Trust Co.* (1919), 286 Ill. 564, 122 N.E. 55; *Webbe v. First Nat'l Bank & Trust Co.* (1985), 139 Ill.App.3d 806, 93 Ill.Dec. 886, 487 N.E.2d 711; *In re Feinberg's Estate* (1948), 82 N.Y.S.2d 879, aff'd 275 A.D. 925, 90 N.Y.S.2d 690.

In *Webbe, supra* a beneficiary sued the trustee for breach of fiduciary duty, mismanagement, and for failing to transfer the trust to the beneficiary. In entering judgment against the beneficiary, the trial court declared:

> *"The general rule is that a trustee found to be without fault is entitled to reimbursement from the trust fund for all expenses properly incurred in administering and defending the trust.* [Citations omitted]. *Such rule does not condition assessment of fees and costs upon the outcome of litigation or allow charging them against the unsuccessful party, unless the claim defended against was groundless or vexatious.*

> .    .    .    .    .

> "[W]hen one of several beneficiaries brings *essentially groundless and unsuccessful litigation against a trustee the purpose of which was to benefit only himself,* no reason suggests itself why the other beneficiaries, who did not join with him, sought no relief and had no voice in the conduct of the case, should share the expense with the initiating beneficiary. If such were not the case, a beneficiary could assault will and trust provisions attempting to increase his individual shares secure in the knowledge that, if he was unsuccessful, the cost would be borne by the other beneficiaries equally and not recovered solely out of the share of the party seeking to further his own ends. This would not seem just."

*Webbe, supra* at 810–11, 487 N.E.2d at 713–14 (emphasis supplied); *See also Patterson, supra.*

The Illinois Supreme Court in *Patterson* determined that an award of attorney's fees against the beneficiary's share of the trust would be justified because the action he brought against the trustee was "frivolous, oppressive and a wrongful attempt to relitigate matters already decided...." *Id.* at 568, 122 N.E. at 56–57. Similarly, in *Webbe,* the court assessed attorney's fees against the beneficiary's distributive share because it found the action was "groundless and brought without reasonable cause." *Webbe, supra* at 811, 487 N.E.2d at 714.

An examination of these cases as well as IC 34–1–32–1(b) reveal that for attorney's fees to be assessed against a beneficiary's share of the trust there must be

some finding that the beneficiary's claim was "frivolous," "unreasonable," "groundless" or "[l]itigated ... in bad faith." The trial court here found *only* that Trustee Frenzel acted "reasonably in defending the action," that the legal expenses were "reasonably incurred" by the Trust, and that the attorney's fees were "properly incurred as an expense of administration of the Fitton Trust and [were] properly paid out of funds of the Trust."[4] *Record* at 1389. While under Ind.Code 30–4–5–11 (1988) these findings are sufficient to permit the attorney's fees to be assessed as an administrative expense against the income of the Trust, *see Gray v. Union Trust Co.* (1938), 213 Ind. 675, 14 N.E.2d 532, that statute does *not* authorize the assessment of attorney's fees *against the distributive share of a particular beneficiary who initiated litigation against the trust.* Rather the authority for such an assessment lies in IC 34–1–32–1(b) and, under that statute, the findings of the trial court are insufficient to support an assessment of attorney's fees against James' distributive share for initiating allegedly meritless litigation. *See also Childs, supra; Webbe, supra; Conley, supra; Patterson, supra; In re Feinberg's Estate, supra.*

As Trustee Frenzel has been found to have acted reasonably in incurring the attorney's fees and there is no proper finding by either court that James' action was frivolous, unreasonable, groundless, or litigated in bad faith, etc., the attorney's fees in question should be a charge against the trust estate as permitted by IC 30–4–5–11.

Judgment reversed as to the assessment of attorney's fees against James distributive share. In all other respects, the judgment of the trial court is affirmed.

SHIELDS and STATON, JJ., concur.

---

4. While it might be inferred that the Ohio litigation was "frivolous", "groundless," etc., the cases and IC 34–1–32–1(b) require that there be a specific finding in that respect in order to charge a beneficiary. The court made no such finding in this case.